1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

ROBERT ARTURO ORTIZ,

Civil No.        07-0494 WQH (PCL)

11

Petitioner,

12

**REPORT AND RECOMMENDATION RE: DENYING PETITION FOR WRIT OF HABEAS CORPUS [DOC. NO. 17],**

vs.

13
14

W. J. SULLIVAN et al.,

**and**

15

Respondents.

**DENYING MOTION FOR STAY AND ABEYANCE [DOC. NO. 28.]**

16
17

**I.      INTRODUCTION**

18
19

        Robert Arturo Ortiz, a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas

20

Corpus pursuant to 28 U.S.C. § 2254 challenging his San Diego County Superior Court conviction in

21

case number SCD158564 for one count of conspiracy to commit kidnapping for robbery, one count of

22

kidnapping for robbery, two counts of kidnapping for ransom, two counts of robbery in concert, one

23

count of robbery, and one count of residential burglary.  (Lodgment No. 1, vol. 4 at 769-76.)  He

24

contends his federal constitutional rights were violated for the following reasons:  the trial court denied

25

his motion for disclosure of juror information regarding potential juror misconduct; there was

26

insufficient evidence to convict him of conspiracy to commit kidnapping for robbery and kidnapping

27

for robbery; the trial court erred in not requiring the jury to unanimously agree on which act constituted

28

movement for purposes of kidnapping for robbery; and the trial court imposed upper terms on counts

five through eight, and consecutive sentences on counts one, three and four.  (First Amended Petition

1   ["Pet."] at 8-10.)

2       The Court has considered the Petition, Respondents' Answer and Memorandum of Points and

3   Authorities in Support thereof (hereinafter "Respt's Mem."), Petitioner's Traverse, and all the

4   supporting documents submitted by the parties.  Based upon the documents and evidence presented in

5   this case, and for the reasons set forth below, the Court recommends that the Petition be **DENIED**.

6   II.    **FACTUAL BACKGROUND**

7       This Court gives deference to state court findings of fact and presumes them to be correct;

8   Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28

9   U.S.C. § 2254(e)(1)(West 2006); see also Parke v. Raley, 506 U.S. 20, 35-36 (1992) (holding findings

10  of historical fact, including inferences properly drawn from such facts, are entitled to statutory

11  presumption of correctness).  The facts as found by the state appellate court are as follows:

12              A.    Prosecution Case
                 . . . .

13
14          In November 2000, Michelle Ramskill-Estey was the manager of a bank in Vista.
        Estey lived in Vista with her seven-year-old daughter Breea at the home of a friend,
        Kimbra Oliver.

15
16          On November 21, 2000, Christopher Butler came to Estey's bank and talked to
        her about opening large accounts.  The two talked for approximately an hour.  Butler's
        girlfriend Lisa Ramirez entered the bank and told Butler he had missed an appointment.
17      Butler and Ramirez departed. [footnote omitted].

18          Later in the day, Estey left work, picked up Breea and arrived home at about 7:00
        p.m.  Estey and Oliver each had a dog.  As Estey approached the house, she noticed a
19      third dog in the yard,  a Rottweiler she had not seen before.  Estey entered the house.  As
        she put away her groceries, three masked and gloved men carrying handguns broke into
20      the house through a rear door.  Estey was thrown to the floor and two of the men put
        their guns to her head.  Based on his eyes, voice and mannerisms, she recognized one of
21      the men as Butler.  One of the other men was Black and very large.  Huggins is Black,
        between six-feet and six-feet, one-inch tall and weighs between 225 and 230 pounds.
22      The third man was very skinny and had a lighter complexion.  Ortiz is known as
        "Bones."  He is five-feet, seven-inches tall and weighs 140 pounds.

23
24          Estey and Breea were tied with duct tape.  Butler told Estey if she did not do as
        she was told, they would kill Breea as Estey watched.  Butler told Estey he knew she was
25      a bank manager and they had been following her and another bank employee for months.
        Butler made comments indicating knowledge of operations at Estey's bank.  Butler asked
26      when Estey's roommate would be home.  He told Estey that in the morning they were
        going to strap Estey, Breea and Oliver with dynamite.  She was shown an object that
27      looked like sticks of dynamite and was told that if she did not do as she was told,  the
        dynamite would be detonated.  She was told that Breea would be disintegrated.  Estey
28      could hear Butler talking to a woman via walkie-talkie.

At about 11:00 p.m., Oliver returned home. As she entered the house two men put guns to her head and took her to her bedroom. Oliver noticed that at all times the three men displayed their guns. She could tell that two of the men were Black and one was Hispanic. Later, Oliver was placed on the couch with Estey and Breea. When Oliver would not calm down, the men taped her and put her on the floor. The men later untaped Estey and Breea. In addition to their guns, the men brought two spears to the house. The men told Oliver they were there to rob Estey's bank.

In the morning Butler told Estey to get ready for work. Butler taped what he told her was dynamite to her back. The dynamite was actually dowels wrapped in red paper. She was told if she tried to remove the dynamite it would explode. "Dynamite" was also taped to Breea and Oliver. Estey was told if she did not do what she was told and if she did not get money from the bank, the dynamite would be detonated.

Estey, with Butler crouched down behind the seat, drove to the bank. Butler communicated with other persons on a walkie-talkie. Estey entered the bank. After the Brink's delivery, she went into the vault with another employee. Estey stated she had to take money because dynamite was strapped to her back and to Breea. Estey took what was later determined to be $360,000 and returned to her car.

Butler gave Estey driving instructions. Eventually, he told her to stop and get out of the car. He told her that she could recover her car on a nearby street and drove off. Estey found her car at the location described. She drove back to her house. The three women removed the dynamite and reported the crime to the police.

. . . .

On February 20, 2001, Ortiz was arrested while hiding in the attic of a house in Milwaukee. Officers found a safe containing $32,855 in the house. Ortiz waived his rights and spoke to officers. Ortiz stated he was recruited by Butler to participate in a bank robbery. Butler explained he did not want to enter the bank to commit the robbery. Instead, fake bombs were to be put on bank personnel to compel them to take money from the bank. Over a period of time Butler, Ramirez and Ortiz conducted a surveillance of the bank, the bank manager and her home.

Ortiz explained they were aware that dogs lived at the manager's house. The night of the crime Ortiz took his dog with him to deal with the manager's dogs. When the dogs at the house started to bark, he released his dog. The dogs played together. The men also took two spears to deal with the dogs.

The men were at Estey's house when she arrived with her daughter. The men waited for about 30 minutes, then broke down the door and entered the house. Ortiz's description of the events the night and morning of the crime generally agreed with the description given by Estey and Oliver.

B.     Defense Case

Neither Huggins nor Ortiz testified. Their attorneys, however, based on what they perceived as anomalies in the prosecution's case, e.g., Butler's lengthy and very visible appearance at the bank the day of the home invasion, the bringing of a dog to Estey's house, Butler's retaining items used in the crimes and the women's financial difficulties, offered the remarkable and highly speculative defense that a conspiracy existed but Huggins and Ortiz were not part of it. The defense offered that Estey, Oliver and Butler planned to take large sums of money from Estey's bank. There was, however, no robbery since Estey was a willing participant in the theft. While the invasion of

07cv0494

Estey's and

Oliver's home occurred, it was a mere charade played out for the benefit of Huggins, Ortiz and most importantly Estey's daughter, Breea.

Breea was seven years old and could not be relied upon as a consistent or convincing liar. It was necessary, therefore, to actually commit the "crimes." In addition, carrying out the robbery, burglary, kidnappings, and assaults in her presence would make Breea's account of events and the claim such a crime had occurred believable. Leaving Huggins and Ortiz unaware of the true nature of the enterprise would make their "performances" more convincing and tend to protect Estey and Oliver. Defense counsel also suggested the men brought spears to the house because a child of Breea's age would be more frightened by such objects than by guns.

Estey and Oliver were to take none of the proceeds of the theft that would go to Huggins, Ortiz, Butler and Ramirez. It was possible, however, in the defense view, that Estey removed $18,400 from the vault in her underwear the day before the supposed invasion of her home. A discrepancy of that amount - there was evidence that in fact no such discrepancy existed - was discovered in the vault the day before the charged crimes. Counsel suggested Estey might also have removed as much as $60,000 in her underwear. The loss of this money would have been covered by the robbery. Estey's and Oliver's real benefit from the crime was a lawsuit Estey planned to file against her employer arising from the effects of the robbery and kidnapping on her, Oliver and Breea. By the time of trial Estey had filed such a suit.

Counsel argued it was not difficult to believe a mother would put her seven-year-old daughter through a long night of terror punctuated by three masked and armed men bursting through the door of her home, duct taping her, her mother and housemate, holding them overnight, strapping what she was told was dynamite to her and the others and then taking her mother away. Counsel explained mothers routinely take their daughter [sic] to theme parks and go with them on thrill rides. In any case, one night of terror for Breea would be made up for by receiving a settlement or judgment that would pay for her college as well as post-graduate education. Counsel also noted children are resilient.

In the defense view, Estey and Oliver planned to and did "double cross" Butler. Estey would tell the police she recognized one of the men who broke into her house as Butler. Butler and the others would be arrested. The investigation of the crime would be closed and the credibility of her case against the bank would be stronger.

If this interpretation of events was accepted, it would provide a defense as to any crimes in which Estey or Oliver were the alleged victims. Whether as to Huggins and Ortiz it would have provided a defense to the conspiracy charges or the crimes in which Breea was the alleged victim, is, given the verdicts, academic.

(Lodgment No. 9 at 2-8.)

//

//

//

//

### III.   **PROCEDURAL BACKGROUND**

On March 29, 2001, the Grand Jury of the County of San Diego, State of California issued an eight-count indictment charging Petitioner with one count of conspiracy to commit kidnapping for robbery, a violation of California Penal Code ("Penal Code") sections 182(a)(1)/209(b)(count one), one count of kidnapping for robbery, a violation of Penal Code section 209(b) (count two), two counts of kidnapping for ransom, a violation of Penal code section 209(a)(counts three and four), two counts of robbery in concert, a violation of Penal Code sections 211/213(a)(1)/209(b) (counts five and six), one count of robbery, a violation of Penal Code section 211 (count seven), and one count of residential burglary, a violation of Penal Code sections 459/460 (count eight). (Lodgment No. 1, vol. 1 at 1- 8.) It was further alleged that Petitioner personally used a firearm, to wit, a handgun, in the commission and attempted commission of each of the offenses, a violation of Penal Code section 12022.53(b). (Id.) In addition, it was alleged as to count one, conspiracy to commit robbery, that Petitioner took property in excess of $150,000 in value, a violation of Penal Code section 12022.6(a)(2). (Id. at 003.)

Following trial, Ortiz was convicted of conspiracy to commit kidnapping for robbery, kidnapping for robbery, two counts of kidnapping for ransom, two counts of robbery in concert, robbery, and residential burglary.[1] (Lodgment No. 2, vol. 4, 769-76.)  The jury also found the firearm allegations true. (Id.) On April 25, 2003, the trial court sentenced Ortiz to three consecutive terms of life with the possibility of parole for counts one, three, and four. (Lodgment No. 2, vol. 12 1538-39.)  The court ordered those terms be served consecutively to an aggregate determinate term of thirty-two years, consisting of terms of ten years for each of the firearm-use violations in counts one, three, and four, and a term of two years for the Penal Code section 12022.6 violation in count one. (Id.) The court stayed terms for the additional counts and struck terms for the remaining special allegations. (Id.)

Ortiz appealed his conviction to the California Court of Appeal for the Fourth Appellate District, Division One, raising three issues:  (1) the trial court erred in refusing to order the disclosure of juror information; (2) the kidnapping for robbery counts were not supported by substantial evidence; and (3) the jury should have been required to unanimously agree on which movement of Estey constituted the movement for purposes of kidnapping. (Lodgment No. 4 at 8, 21, 31.)  In response to an order from

---

[1]Defendants Christopher Huggins and Petitioner were tried together in a jury trial.

the Court of Appeal, both parties next filed letter briefs addressing the applicability of <u>Blakely v.</u> <u>Washington</u>, 542 U.S. 296 (2004) to the case. (Lodgment Nos. 7, 8.) On December 6, 2004, the Court of Appeal upheld Petitioner's convictions but reversed the upper-term sentences on counts five through eight, which the trial court had imposed and then stayed under California Penal Code section 654, citing <u>Blakely v. Washington</u>, 542 U.S. 296 (2004). (<u>See</u> Lodgment No. 9.)

On January 6, 2005, the People filed a petition for review in the California Supreme Court requesting that action on the case be deferred until disposition of the cause pending before that court in <u>People v. Towne</u> and <u>People v. Black</u>. (Lodgment No. 10.) On March 16, 2005, the California Supreme Court granted review pending its decisions in <u>Black</u> and <u>Towne</u>. (Lodgment No. 12.) On September 7, 2005, the California Supreme Court transferred the case to the Court of Appeal with directions to vacate its earlier decision and reconsider the cause in light of the California Supreme Court's decision in <u>Black</u>. (Lodgment No. 13.) On remand, the Court of Appeal affirmed the judgment in its entirety in its October 3, 2005 opinion. (Lodgment No. 14.)

Petitioner filed a petition for review in the California Supreme Court on November 3, 2005 which reiterated the same claims he raised in his opening brief.[2] (Lodgment No. 15.) On December 21, 2005, the California Supreme Court denied the petition for review. (Lodgment No. 16.)

On March 19, 2007, Petitioner filed the present writ of habeas corpus with this Court. On March 21, 2007, Petitioner filed another writ of habeas corpus with this Court, which was designated case number 07cv0521 BEN (POR). The new petition raised the same three claims he raised in the earlier petition with the addition of a <u>Blakely</u> claim. After a review of the petitions in both cases, the court in Case No. 07cv0521 BEN (POR) concluded that they were duplicate petitions except for the addition of the fourth ground for relief stated in 07cv0521, and consolidated it with the lead case 07cv0494 WQH (PCL) on August 8, 2007. On August 13, 2007, the Petition in case number 07cv0521 was filed in case number 07cv0494 as the First Amended Petition, which is considered the operative pleading in this case. Respondent filed an Answer on October 25, 2007. (Doc. No. 26.)

On November 27, 2007, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court which raised only his <u>Blakely</u> claim. (Supp. Lodgment No. 1 at 3.) Ortiz filed a

---

[2]Ortiz did not raise a <u>Blakely</u> claim in his Petition for Review regarding any sentencing issue.

Traverse and a Motion for a Stay and Abeyance in the present case on December 17, 2007. (Doc. Nos. 21, 28.) On May 14, 2008, the California Supreme Court silently denied the Petition. (Supp. Lodgment No. 2.) On June 20, 2008, Ortiz filed a Notice of Denial of Unexhausted Claim in the present case. (Doc. No. 33.)

## IV.    DISCUSSION

### A.    Scope of Review

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006) (emphasis added).

"The Anti-Terrorism & Effective Death Penalty Act [AEDPA] establishes a 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Womack v. Del Papa, 497 F. 3d 998, 1001 (9th Cir. 2007) (quoting Woodford v. Viscotti, 537 U.S. 19, 24 (2002)). To obtain federal habeas relief, Ortiz must satisfy either § 2254(d)(1) or § 2254(d)(2). See Williams v. Taylor, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle

from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13; see also Lockyer v. Andrade, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by Lockyer, 538 U.S. at 75-76); accord Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. Early v. Packer, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law. Id.

**B.     Analysis**

Ortiz alleges his federal constitutional rights were violated because: (1) the trial court denied his motion for disclosure of juror information regarding potential juror misconduct; (2) there was insufficient evidence to convict him of conspiracy to commit kidnapping for robbery and kidnapping for robbery; (3) the trial court erred in not requiring that the jury unanimously agree on which act constituted movement for purposes of kidnapping for robbery; and (4) the trial court imposed consecutive sentences on counts one, three and four, and aggravated terms on counts five through eight in violation of Blakely. (Pet. at 8, 10.)

Respondent asserts, with respect to claims one and two, the state courts' adjudication of the claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Resp't's Mem. at 10, 16.) As to claim three, Respondent argues the claim fails to state a federal constitutional question. (Id. at 16.) Regarding claim four, Respondent argues that because Petitioner failed to exhaust his claim concerning the trial court's imposition of aggravated terms and consecutive sentences before filing his petition, the Court should either dismiss the petition as "mixed" or permit Petition to amend the Petition by dismissing the claim. (Id. at 19.)

///

1.     *Impartial Jury*

In claim one, Ortiz alleges that the trial court violated his Sixth Amendment right to an impartial jury when the trial court refused to order the disclosure of juror information concerning three events involving jurors. (Pet. at 8.)  Specifically, Petitioner contends that (1) a sitting juror made a statement to another sitting juror and an alternate which indicated his predisposition to vote in favor of guilty; (2) the jury was observed acting and speaking inappropriately while waiting in the hallway before the verdicts were read, including one juror who commented, "should we do the wave when the verdict is read?"; and (3) several jurors appeared to be laughing when defense counsel objected to the prosecutor personally attacking the defense. (Id.)  Ortiz further complains that the jury reached its verdicts with remarkable speed in light of the gravity of the offenses, which indicates jury bias. (Traverse at 14-15.) Respondent counters that the alleged misconduct did not likely improperly influence the verdict, and the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Respt's Mem. at 17.)

Petitioner raised this claim in a habeas corpus petition he filed in the California Supreme Court, (lodgment No. 15 at 5-17), which was denied without citation of authority, (lodgment No. 16). Accordingly, this Court must "look through" to the California appellate court's decision denying the claim. See Ylst, 501 U.S. at 801-06.  That court summarized the trial court's proceedings regarding Petitioner's motion for confidential juror information as follows:

> Approximately two months after the verdicts were returned, Ortiz sought confidential juror identification information pursuant to Code of Civil Procedure Code section 237 to allow the preparation of a motion for a new trial based on a claim of jury misconduct.  By declaration attached to the motion, counsel noted three factors that suggested possible improper conduct by the jury and that required he contact jurors.
>
> The first act Ortiz believes might possibly suggest misconduct was an incident in which an alternate juror reported to the court a conversation in which one juror stated to another that the closing argument made by Huggin's counsel was "bullshit." The juror who made the remark was dismissed from the jury.  Defense counsel requested the juror to whom the statement was made also be removed since he had at first denied hearing the statement.  The request was denied.
>
> The records reveals the following concerning this incident: After Huggins's counsel finished his highly interesting closing argument a recess was taken.  An alternate juror reported to the court that during the recess, Juror No. 7, referring to the argument of defense counsel, stated in the alternate juror's and Juror No. 12's presence: "That was the biggest load of bullshit that I've heard."
>
> At a hearing the next day, Juror No. 7 was asked if during the last recess he had a conversation with other jurors concerning the argument of counsel.  He stated he could

remember no such conversation. Juror No. 12 stated that during the recess he had talked with Juror No. 7 and an alternate juror. Juror No. 12 stated there might have been some comment by a juror made during the recess concerning argument but he could not recall what was said. He stated he could recall no statement concerning the content of argument or the performance of any attorney by Juror No. 7.

Both defense counsel asked the court to dismiss Juror Nos. 7 and 12. Juror No. 12 was examined again. When asked if at the recess the day before Juror No. 7 stated that the defense closing argument was "bullshit," he stated he remembered something like that but could not remember the exact words. The court asked if anything said by any juror to him during the case would affect his ability to be fair. He said no.

The trial court dismissed Juror No. 7. The court refused to dismiss Juror No. 12, stating it appeared he was not concentrating on Juror No. 7's comment during the recess and was sincere in saying he could deliberate with an open mind.

Counsel next argued in his request for confidential juror information that the relatively short length of jury deliberations in this very serious case suggested misconduct.

Jury deliberations commenced at 11:38 a.m. on September 11, 2002. Lunch was taken from noon to 1:30 p.m. At 3:40 p.m., the jury asked to have the testimony concerning the defendant's confessions read to them. The jury continued deliberations until 4:27 p.m. September 12 began for the jury at 9:10 a.m. with the reading of the requested testimony. The reading concluded at 10:25 a.m. At 11:29 a.m. the jury notified the court it had reached a verdict.

The verdict forms for conspiracy, kidnapping for robbery and ransom, robbery and burglary are dated September 11, while the verdict forms for the robbery in concert counts as to Oliver and Estey are dated September 12.

As a final basis for seeking juror information, counsel's declaration states that jurors engaged in inappropriate behavior. He states that while the jury was outside the courtroom waiting to enter with its verdicts, one juror wondered aloud if the jury should do the "wave" when the verdicts were read. This apparently referred to the practice in sports stadiums of fans rising and sitting down in a sequence that to the observer produces a wave-like movement in the stands.

The declaration also states that during the prosecutor's closing argument when Huggin's counsel objected to the prosecutor personally attacking the defense, several jurors appeared to laugh.

The record reveals that at the beginning of closing argument the prosecutor suggested the FBI should hire defense counsel because they figured out the true nature of the crime when no one else had. Huggin's counsel objected that the prosecutor was mischaracterizing the defense argument. The record does not mention any laughter in the courtroom.

The trial court denied the motion for confidential juror information. With regard to the incident in which a juror stated the argument of defense counsel was "bullshit," the court noted a thorough hearing was conducted concerning that matter before deliberations began. The juror who made the statement was dismissed. The court stated that there was no basis for excusing any other juror and any further inquiry would be a mere fishing expedition.

The court concluded Ortiz's additional arguments that the jury acted inappropriately or did not fully consider the case were mere speculation based on

07cv0494

1   conclusory statements.

2   (Lodgment No. 14 at 19-22.)

3   "The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors.

4   The bias or prejudice of even a single juror would violate [a defendant's] right to a fair trial." Dyer v.

5   Calderon, 151 F.3d 970, 973 (9th Cir 1998) (en banc) (applying rule to habeas petition not subject to

6   AEDPA); see also Green v. White, 232 F.3d 671, 672, 676-77 (9th Cir. 2000) (applying rule to habeas

7   petition subject to AEDPA). "A court confronted with a colorable claim of juror bias must undertake

8   an investigation of the relevant facts and circumstances . . .[however] due process requires only that all

9   parties be represented, and that the investigation be reasonably calculated to resolve doubts raised about

10  the juror's impartiality." Dyer, 151 F.3d at 975; but see Tracey v. Palmateer, 341 F.3d 1037, 1044 n.4

11  (9th Cir. 2003) (stating that Dyer's statement that a court "must" hold an investigation may not apply

12  to petitions subject to AEDPA).

13  At the end of the day on September 10, 2002, the court was notified by an alternate juror that

14  Juror No. 7 allegedly made an inappropriate comment to the alternate and Juror No. 12 during a break.

15  (Lodgment No. 2, vol. 10 at 1381.) As soon as court was reconvened the next morning, September 11,

16  2002, the trial court undertook an investigation into the allegation. (Lodgment No. 2, vol. 11 at 1390.)

17  After interviewing each of the jurors involved in the incident, it remained unclear what, if anything, was

18  said by Juror No. 7. (Id. at 1391- 92, 1400, 1409.) However, because there were conflicting reports

19  about the incident, the investigation did not remove all doubt as to the impartiality of Juror No. 7;

20  therefore, the court removed Juror No. 7 and also put a different alternate on the panel. (Id. at 1411-12.)

21  Approximately two months after the trial concluded, Petitioner moved the court for release of

22  confidential juror information. (Lodgment No. 2, vol. 5 at 927.) On March 6, 2003, Ortiz filed a request

23  for a hearing on his petition for juror information. (Lodgment No. 2, vol. 5 at 943-53.) The trial court

24  held a hearing on the motion for release of juror information on April 4, 2003. (Lodgment No. 2, vol.

25  11 at 1479.) At the hearing, the trial court explained that "at the time that occurred, the court held what

26  I considered to be a very thorough hearing with all three of those jurors, with the court and counsel

27  present . . . Even though the one juror denied that he made the statements, I still kicked him off the jury

28  in an abundance of caution, because it was reported to me by the other two jurors that he had made the

comments. So I had some concerns about his ability to be a fair and impartial juror in this matter." (Id.

at 1480.) According to the Court of Appeal, the trial court properly addressed Ortiz's motion for release of confidential juror information at the hearing because the trial court "addressed at length Ortiz's arguments relating to why disclosure was required and gave specific reasons for finding them meritless." (Lodgment No. 14 at 25.) The court went on to state that "while the matter was handled in a somewhat informal manner, it is clear the trial court, after reviewing the petition and declarations, found no prima facie case showing good cause for the release of confidential juror information. There was no necessity, therefore, to set a hearing or notify affected jurors." (Id.)

As required under Dyer, and noted by the Court of Appeal, the trial court conducted an investigation into the alleged juror misconduct both during trial, when Juror No. 7 allegedly made a comment that revealed a bias toward guilt, and when Petitioner moved for the release of confidential juror information, almost two months after the verdicts were returned. See Dyer, 151 F.3d at 975. During both hearings, the parties were represented and the court reviewed the facts until any doubts were resolved concerning the juror's ability to be impartial. Id. Ortiz has not presented any additional evidence in support of his claim of juror bias. Therefore, the Court of Appeal's denial of this claim was not contrary to, nor an unreasonable application of, federal law.

Concerning Ortiz's claims that a member of the jury suggested doing the "wave" when the verdict was read, that the jury laughed when the prosecutor allegedly made a personal attack on defense counsel during closing argument, and that the jury deliberations were exceedingly fast, the trial court commented that the allegations were "complete speculation" and that there was no showing of good cause to disclose the jurors' names. (Lodgment No. 2, vol. 11 at 1481.) In reviewing this claim, the Court of Appeal stated:

> The question remains whether the trial court abused its discretion in finding no prima facie showing of good cause. It did not. Ortiz's claim that it was necessary to contact jurors because they allegedly laughed at an objection made by Huggin's counsel during argument, a juror suggested that when the verdicts were returned the jury do the "wave" and their deliberations were too short did not establish good cause.

> It is not clear there was any laughter during argument and if there was it would not suggest misconduct on the part of any juror. Next, that a juror, undoubtedly under some stress, made a joke concerning the jury doing the wave is equally as meaningless. Further, the jury's deliberations were not lengthy. There are, however, no specific amounts of time required in a jury's consideration of a case. With all due respect to appellants and their trial counsel, this was not a close case and the defenses offered, to say the least, were not compelling. Relatively brief deliberations are not inconsistent with the evidence presented.

1   (Lodgment No. 14 at 26.)

2       The trial court investigated these allegations at the hearing for release of juror information, with

3   counsel present for both parties, and reviewed the facts surrounding the alleged incidents of misconduct

4   as mandated under Dyer. Dyer, 151 F.3d at 975. After conducting the inquiry, the trial court found no

5   misconduct. Ortiz has presented no additional evidence of bias or misconduct. Therefore, the state

6   court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly

7   established Supreme Court law. Williams, 529 U.S. at 412-13. Ortiz is not entitled to relief as to this

8   claim.

9           2.      *Sufficiency of the Evidence*

10      Ortiz alleges in claim two that his due process rights under the Fifth Amendment were violated

11  because the evidence was insufficient to support the convictions for conspiracy to commit kidnapping

12  for robbery, and kidnapping for robbery (together "aggravated kidnapping"). (Pet. at 8.) Specifically,

13  Petitioner argues that the movements to which Estey was subjected were for the sole purpose of

14  committing the robbery, and did not increase her risk of harm as required to sustain the charge of

15  aggravated kidnapping. (Traverse at 20.)      Respondent counters that the Court of Appeal's

16  determination that there was sufficient evidence to support Petitioner's convictions was neither contrary

17  to, nor an unreasonable application of, controlling United States Supreme Court authority. (Respt's

18  Mem. at 16-17.)

19      Petitioner raised this claim in a habeas corpus petition he filed in the California Supreme Court,

20  which denied the claim without citation of authority. (Lodgment Nos. 15, 16.) Accordingly, this Court

21  must "look through" to the California appellate court's decision denying this claim as the basis for its

22  analysis. Ylst, 501 U.S. at 801-06. That court stated:

23          The prosecutor in both his opening statement and in argument made clear to the
            jury that the movement supporting the charges of kidnapping to commit robbery and
24          conspiracy to kidnap for the purposes of robbery was the removal of Estey from her
            house to the point of her release.
25
            The jury could reasonably conclude that movement was not merely incidental to
26          the robbery and substantially increased Estey's risk of harm. Butler did not merely
            confront Estey at her desk in the bank and tell her to go to the vault and remove money.
27          He made her drive several miles from her home to the bank at gunpoint and strapped
            with what she was told was dynamite as part of an elaborate scheme to rob the bank.
28          There was nothing merely incidental about such movement. Removing Estey from her
            house in a state of near panic, at gunpoint, for a movement of considerable distance
            increased the possibility of contact with other persons and possibly the police and could

                                                    -13-                                          07cv0494

reasonably be seen by the jury as having substantially increased the risk of harm above that necessarily present in any robbery.  The evidence was sufficient to convict Ortiz of kidnapping for the purposes robbery and conspiracy to kidnap for the purposes of robbery.

(Lodgment No. 14 at 28.)

The clearly established Supreme Court law regarding sufficiency of the evidence claims is set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  In <u>Jackson</u>, the Supreme Court held that the Fourteenth Amendment's Due Process Clause is violated "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 324.

In determining whether sufficient evidence has been presented, the Court must accept the elements of the crime as defined by state law.  <u>See Jackson</u>, 443 U.S. at 324 n.16.  California Penal Code section 209, subdivision (b)(1), makes "'[a]ny person who kidnaps or carries away any individual to commit robbery" guilty of kidnapping for robbery.  Cal. Penal Code §209 (b)(1); <u>see also</u> <u>Aponte v. Gomez</u>, 993 F.2d 705, 707 (9th Cir. 1993) (federal courts are bound by a state court's construction of its own penal statutes, and must defer to that interpretation unless it is "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation.").  Further, "'[k]idnapping for robbery, or aggravated kidnapping, requires movement of the victim that is not merely incidental to the commission for the robbery, and which substantially increases the risk of harm over and above that necessarily present in the crime of robbery itself.'" <u>People v. Hillhouse</u>, 27 Cal. 4th  469, 498 (2002)(citation omitted).  California Jury Instructions, Criminal ("CALJIC") No. 9.54, which was given to the jury, defines kidnapping as "the unlawful movement by physical force of a person without that persons' consent for a substantial distance where such movement is not merely incidental to the commission of the [robbery] and where the movement substantially increases the risk of harm to the person moved, over and above that necessarily present in the crime of [robbery] itself." (CALJIC No. 9.54, Lodgment No. 1, Vol. 3 at 638.)

Ortiz argues that:

[u]nlike other robbery victims, Estey knew exactly where she was going, and knew that it was a place of safety (the bank).  She was driving and hence the concerns of her leaping from the vehicle were not probable.  [Defendant] Butler had no greater opportunity to commit offense against Estey than he did at her home.  On the contrary, Butler was on his best behavior with Estey while they were driving about in public and he obliged to remain crouched behind the seat out of public view.

-14-

(Traverse at 19.)

For this Court to conclude that Ortiz's aggravated kidnapping convictions were based on insufficient evidence, <u>Jackson</u> requires more than just the possibility that the jury could have come to different conclusion than they did.  Rather, "viewing the evidence in the light most favorable to the prosecution," the Court must find that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  <u>Jackson</u>, 443 U.S. at 319, 324.  That is not the case here.  Contrary to Petitioner's assertions, the jury had ample evidence with which to find beyond a reasonable doubt that Ortiz was guilty of aggravated robbery.  The movement of Estey from her home to the bank considerably increased the risk of harm to the victim because it meant Estey was forced to leave her home with what she believed was dynamite strapped to her back, at gunpoint, and drive a substantial distance to the bank while under this duress.

The state court did not announce the sufficiency of the evidence standard it applied in its opinion, but, as noted above, found under state law that "[t]he jury could reasonably conclude that movement was not merely incidental to the robbery and substantially increased Estey's risk of harm." (Lodgment No. 14 at 28.)  In so finding, it is evident that the state court reviewed the evidence and found that the jury could have reasonably found proof of guilt beyond a reasonable doubt as required under <u>Jackson</u>. In <u>Early v. Packer</u>, 537 U.S. 3 (2002), the Court held that the state court need not explicitly cite to federal law, or even be aware of federal law, as long as its result or reasoning did not conflict with clearly established federal law.  Although the state court did not announce the standard it applied to Ortiz's sufficiency of the evidence claim, its findings comport with <u>Jackson</u>.  Thus, the state court's decision is not "contrary to" nor is an unreasonable application of <u>Jackson</u>.  <u>See</u> <u>Williams</u>, 529 U.S. at 412-13.  Ortiz is not entitled to relief as to this claim.

3.   *Right to Unanimous Jury Verdict*

In claim three, Ortiz argues that his "right to due process and his state created right to a unanimous jury was violated when the jury was not required to unanimously agree on which movement of the victim constituted movement for the purpose of kidnapping."[3] (Pet. at 10.)  Respondent counters

---

[3] Petitioner further argues that the state court decision was a violation of his right to an impartial jury because the prosecutor failed to make a proper election of offenses, and the trial court failed to instruct the jury on what movements constituted asportation for purposes of the charge. (<u>Id.</u> at 23.) Ortiz fails to show how either of these actions violates his right to an impartial jury; rather, his argument is based on how these actions allegedly

07cv0494

that Petitioner is not entitled to federal habeas corpus relief on this claim because the claim fails to state

a federal constitutional question.  (Respt's Mem. at 18.)

Ortiz raised this claim in his habeas corpus petition filed in the California Supreme Court, which

was denied without citation of authority.  (See Lodgment No. 15, 16.)  As before, this Court must "look

through" to the California appellate court's decision denying the claim.  See Ylst, 501 U.S. at 801-06.

In denying this claim, the Court of Appeal stated:

> In criminal cases the jury's verdict must be unanimous.  When, therefore, the evidence suggests more than one discrete crime, the prosecution must elect between those crimes or the jury must be instructed it may return a verdict of guilty only if there is unanimous agreement the defendant is guilty of the same crime.  Conversely, when the evidence suggests only a single discrete crime, no unanimity instruction is required.  (People v. Russo (2001) 25 Cal. 4th 1124, 1132; People v. Sanchez (2001) 94 Cal. App. 4th 622, 631.)

> No unanimity instruction is required when the crime is a continuing one, i.e., while the crime may involve the doing of individual acts, the conduct is essentially indivisible in a real or evidentiary sense.  (People v. Riel (2000) 22 Cal. 4th 1153, 1199; People v. Sanchez, supra, 94 Cal. App. 4th at p. 631.)  "[N]o unanimity instruction is required when the acts alleged are so closely connected as to form part of one continuing transaction or course of criminal conduct.  'The "continuous conduct" rule applies when the defendant offers essentially the same defense as to each of the acts, and there is no reasonable basis for the jury to distinguish between them' [Citations.]"  (People v. Dieguez (2001) 89 Cal. App. 4th 266, 275.)

> As noted above, the prosecution made clear to the jury in both opening statement and argument that the conspiracy and kidnapping for purposes of robbery charges referred only to the movement of Estey from her home to the point she was finally released.  This was a sufficient election such that the charges in counts 1 and 2 referred only to the movement of Estey from her house to her point of her release.  (People v. Mayer (2003) 108 Cal. App. 4th 403, 418; People v. Hawkins (2002) 98 Cal. App. 4th 1428, 1455; People v. Diaz (1987) 195 Cal. App.3d 1375, 1382-1383.)  The acts involved in that movement were so closely connected in time and intent they formed a single criminal event and no unanimity instruction was required.

(Lodgment No. 14 at 29-30.)

The constitutional requirement of a unanimous jury verdict does not extend to non-capital state

criminal trials.  Schad v. Arizona, 501 U.S. 624, 634 n.5 (1991); Johnson v. Louisiana, 406 U.S. 356

(1972); Apodaca v. Oregon, 406 U.S. 404, 410-11 (1972).  Jury unanimity in non-capital cases is not

a requisite of due process or equal protection under the Fourteenth Amendment.  Johnson, 406 U.S. 356,

359 (1972).  In general, a state court's interpretation of state law is binding on a federal court.  See

Wainwright v. Goode, 464 U.S. 78, 84 (1983); Missouri v. Hunter, 459 U.S. 359, 368 (1983); Bueno

---

violated his right to due process.  Accordingly, the court limits its analysis to Ortiz's due process arguments.

v. Hallahan, 988 F.2d 86, 88 (9th Cir. 1993).  However, a defendant's federal due process rights can be violated if a state law is applied arbitrarily, rendering the proceedings fundamentally unfair.  Estelle, 502 U.S. at 67-68; Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).

Because there is no federally created right to a unanimous jury verdict, Ortiz can prevail on this claim only if he can demonstrate that the state court's determination of this claim was so arbitrary that it rendered the proceedings fundamentally unfair.  See Jammal, 926 F.2d 919-20.  Ortiz argues that the prosecution failed to make a proper election concerning which movement supported the charge at the commencement of trial as required under California law; thus, Ortiz argues that the trial court was required to give an unanimity instruction to the jury requiring them to agree on which movement of Estey constituted asportation for purposes of the aggravated kidnapping charge.  (Traverse at 23-24.)  According to Ortiz, the prosecution made a statement during closing argument, which was not a proper election of offenses; thus, because there were multiple movements of Estey which could have constituted asportation for purposes of kidnapping for robbery, it was impossible to know whether the jury agreed on one particular movement as the basis for the kidnapping portion of the charge without the unanimity instruction.   (Id. at 23.)

Under California law, "[w]hen a defendant is charged with a single offense, but there is proof of several acts, any one of which could support a conviction, either the prosecution must select the specific act relied upon to prove the charge, or the jury must be instructed that all the jurors must agree  that the defendant committed the same act or acts."  People v. Mayer, 108 Cal. App. 4th 403, 418  (2003).  Furthermore, the trial court has a sua sponte duty to give the jury an unanimity instruction if the prosecution fails to sufficiently make an election.  (Id.)  As the Court of Appeal found in its disposition of this claim, the prosecutor stated in both opening statement and argument that the aggravated kidnapping charges referred only to the "movement of Estey from her home to the point she was finally released." (Lodgment No. 14 at 29- 30.)  This was a proper election under California law.  See Mayer, 108 Cal App. 4th at 418 (stating that a "prosecutor's statements and arguments were an election for jury unanimity purposes"); People v. Hawkins, 98 Cal. App. 4th 1428, (2002) (stating that a prosecutor's election of specific conduct constituting crime charged during opening argument sufficient.)

Because the prosecution made a proper election concerning which movement of Estey

-17-

07cv0494

1    constituted asportation for the conspiracy to commit kidnapping for robbery, and kidnapping for robbery

2    charges, the state court reasonably concluded that the acts which served as the basis for the aggravated

3    kidnapping charges were part of a continuous course of conduct, and therefore no unanimity instruction

4    was required. <u>See</u> <u>People v. Sanchez</u>, 94 Cal. App. 4th 622,631 (2001) (no unanimity instruction

5    required where criminal acts are so closely connected as to form a single transaction or where the

6    offense consists of a continuous course of conduct). Ortiz contends that the "continuing course of

7    conduct"exception to the requirement of an unanimity instruction does not apply here because the

8    offense of kidnapping for robbery has an unique element in that it requires the jury to determine which

9    of many possible movements constitutes asportation unlike the cases which recognize the exception.

10    (Traverse at 24-25.) However, where a prosecutor properly designates which movement supports the

11    charge of kidnapping for robbery, as here, the jury is not required to determine *which* act supports the

12    charge; therefore, no unanimity instruction is mandated. <u>See</u> <u>Sanchez</u>, 94 Cal. App. 4th at 631.

13        Accordingly, the disposition of this claim by the California Court of Appeal was in accordance

14    with state law and was not "so arbitrary that it violated due process by rendering the proceedings

15    fundamentally unfair." <u>Estelle</u>, 502 U.S. at 67-68; <u>Jamal</u>, 926 F.2d at 919-20. Petitioner is not entitled

16    to federal habeas corpus relief on this claim.

17        4.    *Sixth Amendment*

18        Petitioner contends in claim four that the trial court's imposition of consecutive sentences on

19    counts one, three and four, and upper terms on counts five through eight and was based on findings not

20    found to be true by a jury in violation of his Sixth Amendment right to a jury trial under <u>Apprendi v.</u>

21    <u>New Jersey</u>, 530 U.S. 466 (2000), and its progeny. (Pet. at 10.) Respondent counters that Petitioner did

22    not present this claim to the California Supreme Court and therefore the court should either dismiss the

23    entire petition as "mixed" or allow Petitioner to amend the petition by dismissing the claim.[4] (Respt's

24    Mem. at 19.)

25        Petitioner did not raise this claim in the California Court of Appeal; however, the parties filed

26    briefs on this issue in response to a request from the court. (Lodgment Nos. 7, 8.) On December 6,

27

28        [4]Respondent did not address the merits of claim four in the Answer, instead focusing solely on the exhaustion issue. However, on November 27, 2007, Petitioner filed a Petition for Writ of Habeas Corpus raising this claim in the California Supreme Court, which was silently denied on May 14, 2008. (Supp. Lodgment Nos. 1, 2.) Therefore, the exhaustion issue is moot.

07cv0494

1  2004, the Court of Appeal determined that <u>Blakely</u> did not apply to the imposition of consecutive

2  indeterminate terms, but that under <u>Blakely</u> the upper term sentences on counts five through eight were

3  unconstitutional, reversing those sentences. (Lodgment No. 9 at 31.) As previously noted, Respondent

4  filed a Petition for Review on January 11, 2005 with the California Supreme Court requesting that court

5  defer action on the case until disposition of <u>People v. Towne</u>, 78 Cal. Rptr. 3d 530 (2008) and <u>People</u>

6  <u>v. Black</u>, 35 Cal. 4th 1238 (2005). (Lodgment No. 10.)  In response, Petitioner filed an Answer in state

7  court which addressed this claim, and raised the claims previously submitted to the California Court of

8  Appeal. (Lodgment No. 11.) On March 16, 2005, the California Supreme Court granted the Petition

9  for Review, deferring action until a decision had been reached in <u>Towne</u> and <u>Black</u>.  (Lodgment No.

10  12.) On September 12, 2005, the California Supreme Court transferred the action back to the Court of

11  Appeal, with directions to vacate its decision and to reconsider the cause in light of the decision in

12  <u>Black</u>, 35 Cal. 4th 1238 (2005).  On remand, the California Court of Appeal vacated its decision and

13  affirmed the trial court's judgment in its entirety.  (Lodgment No. 14.)

14  Ortiz raised this claim in a habeas corpus petition he filed in the California Supreme Court on

15  November 27, 2007. (Supp. Lodgment No. 1.) On May 14, 2004, the California Supreme Court silently

16  denied the petition. (<u>See</u> Supp. Lodgment No. 2.)  As before, this Court must "look through" to the

17  California appellate court's decision denying the claim. <u>See</u> <u>Ylst</u>, 501 U.S. at 801-06.  That court

18  summarized Petitioner's claims as follows:

19  [Ortiz] was sentenced to three consecutive indeterminate life terms. Another life
20  term was stayed pursuant to section 654.  A consecutive 32-year determinate term was
   added to the firearm enhancements and the great taking enhancement.  As to the
   remaining four convictions, for crimes punishable under the determinate sentencing law,
21  [Ortiz] [was] sentenced to the aggravated terms.  The determinate sentences on the four
   counts were stayed pursuant to section 654.
22

23  [Ortiz] argues the trial court's decisions that the indeterminate terms would be
   served consecutively, to impose the aggravated terms on the convictions punishable
   under the determinate sentencing law and to impose the upper term on the section
24  12022.5, subdivision (a), firearm use enhancement as to count 8 were discretionary
   sentencing decisions based on factors not found true by the jury, and thus, pursuant to
25  <u>Blakely</u>, violated [his] right to trial by jury.

26  (Lodgment No. 14 at 30.)

27  The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right

28  to a trial by jury. <u>Duncan v. Louisiana</u>, 391 U.S. 145, 149-150 (1968). In <u>Apprendi v. New Jersey</u>, 530

U.S. 466 (2000), the Court held that the Fourteenth Amendment right to due process and the Sixth

Amendment right to trial by jury incorporated therein, requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 476-77, 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Court defined the term "statutory maximum" as used in Apprendi to mean "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. at 303.  The Court in United States v. Booker, 543 U.S. 220 (2005), found that there "is no relevant distinction between the sentence imposed pursuant to the Washington statutes in Blakely and the sentences imposed pursuant to the Federal Sentencing Guidelines." Id. at 235.  The Booker Court decided, however, that if the factors used by a trial judge to impose a sentence in the upper range are not mandatory, but merely advisory, "their use would not implicate the Sixth Amendment [because judges may] exercise broad discretion in imposing a sentence within a statutory range." Id. at 233.

The California Supreme Court in People v. Black attempted to salvage California's sentencing scheme by finding that the "statutory maximum" for Apprendi purposes was the entire range of terms, from lower through upper, and that because the factors used to impose upper terms were subject to a reasonableness requirement, they were the functional equivalent of the advisory provisions of the federal guidelines. Black, 35 Cal. 4th at 1255-56, vacated by Black v. California, 127 S.Ct. 1210 (2007). In Cunningham v. California, 549 U.S. 270 (2007), however, the Supreme Court held that California's determinate sentencing law ("DSL") violated a defendant's Sixth Amendment right to a trial by jury because it placed sentence-elevating fact-finding within the judge's province. Id.  The Court stated that California's sentencing scheme was unconstitutional to the extent it permitted imposition of upper term sentences based on findings made by a judge, other than the fact of a prior conviction, under a preponderance of the evidence standard, rather than by a jury beyond a reasonable doubt.  Id.

Subsequently, the California Supreme Court vacated its earlier decision in People v. Black ("Black I"), after a remand from the United States Supreme Court for reconsideration in light of Cunningham.  See People v. Black, 41 Cal. 4th 799, 805 (2007) ("Black II ").  Black II upheld Black's sentence, finding that, "under the DSL[,] the presence of one aggravating circumstance renders it lawful for the trial court to impose an upper term sentence." Id. at 815.

Recently, the Ninth Circuit determined that Cunningham should be applied retroactively.  In

-20-

1   Butler v. Curry, 528 F.3d 624 (9th Cir. 2008), the court reasoned that "the Supreme Court's Sixth

2   Amendment case law at the time Butler's conviction became final compelled the conclusion that

3   California's DSL was unconstitutional" and therefore, Cunningham did not announce a new rule of

4   constitutional law under the Teague non-retroactivity rule. Id. at 634. Accordingly, the court held that

5   because Cunningham did not announce a new rule of constitutional law it may be applied retroactively

6   on collateral review. Id. at 639. The case law on a defendant's Sixth Amendment rights was therefore

7   clearly established when Ortiz' conviction became final. See Butler 528 F.3d at 640.

8                  A.    *Consecutive Sentences*

9          Ortiz claims that the trial court's imposition of three consecutive life sentences on counts one,

10  three and four based on the fact that there were three separate and distinct victims violates the principles

11  announced in Blakely. (Traverse at 32.) Respondent does not address this argument.

12         In its denial of this claim, the Court of Appeal stated:

13             The trial court sentenced [Ortiz] to three consecutive life terms. The court cited
           the reasons listed in the probation report as the basis for consecutive sentences. The
14         probation report, in turn, recommended consecutive sentences because there were three
           separate victims.
15             . . . .

16             In this case the jury found [Ortiz] guilty of separate kidnapping offenses
           involving three different victims. [Ortiz] was "entitled" to be separately sentenced for
17         each of the offenses. The trial court's discretionary decision to impose the sentences
           consecutively did not run afoul of the new Sixth Amendment requirements imposed by
18         Blakely and Apprendi v. New Jersey, (2000) 530 U.S. 466.

19  (Lodgment No. 14 at 32-33.)

20         The United States Supreme Court has never held that the rights to a jury trial and proof beyond

21  a reasonable doubt apply to the imposition of consecutive sentences. Instead, Apprendi, Blakely, and

22  Booker focused on the finding by a trial court of a fact "that increases the penalty for a crime beyond

23  the prescribed statutory maximum." Blakely, 542 U.S. at 301; Apprendi, 530 U.S. at 490. The Ninth

24  Circuit has held, albeit prior to Apprendi and Blakely, that: "The decision whether to impose sentences

25  concurrently or consecutively is a matter of state criminal procedure and is not within the purview of

26  federal habeas corpus." Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994)(citing Ramirez

27  v. Arizona, 437 F.2d 119, 120 (9th Cir. 1971)). The Ninth Circuit has since determined that Apprendi

28  is not implicated by the decision to run sentences consecutively in the context of the federal guidelines

    when the sentences did not violate Apprendi in their own right. United States v. Buckland, 289 F.3d

558, 570-72 (9th Cir. 2002).

Ortiz received consecutive life sentences for each of the following crimes:  Conspiracy to commit kidnapping for robbery (count one), with Michelle Estey as the intended victim;  kidnapping for ransom  (count three), with Kimbra Oliver as the victim; and kidnapping for ransom (count four), with Breea as

the victim.  (Lodgment No. 1, vol. 1 at 1-5; Lodgment No. 2, vol. 12 at 1538. )   Petitioner vigorously contends that concurrent sentences are the relevant "statutory maximum" and that the multiple victim  reason is insufficient to justify imposition of consecutive sentences because the trial court did not make special findings.  (Traverse at 32-34.)  However, as the Court of Appeal noted, Ortiz was convicted of three distinct crimes with different victims, and the trial court was authorized to impose consecutive sentences for each crime.  The state court's determination did not implicate Apprendi and its progeny, as the decision to impose consecutive sentences did not require the trial court make a factual finding that increased the penalty for a crime beyond the prescribed statutory maximum.  See Blakely, 542 U.S. at 301; Apprendi, 530 U.S. at 490.

Thus, with respect to the imposition of consecutive sentences, the adjudication by the state court was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts.  Williams, 529 U.S. at 412-13.  Ortiz is not entitled to relief on this claim.

### B.   *Imposition of Aggravated Terms*

Petitioner argues that the trial court violated his Sixth Amendment right to a trial by jury under the principles announced in Blakely and Cunningham, because it imposed the upper term on counts five through eight, and the upper term for the gun enhancement in counts five through seven based on facts not found true by the jury.  (Pet. at 10, Traverse at 30.)  Respondent does not address Ortiz's claim.

The California Court of Appeal's decision reflects the state of the law immediately following the California Supreme Court's decision in Black I insofar as it stated:

> In People v. Black, . . . 35 Cal.4th 1238, the Supreme Court addressed the question of whether the decision in Blakely applied to the selection of upper term sentences under the California sentencing system.  The court there concluded that the upper term sentence is the authorized maximum sentence for a conviction for any offense for which such sentence is possible.  Accordingly, [Ortiz] [was] not entitled to a jury trial on the sentencing factors considered by the trial judge.  The upper term sentences were lawfully imposed on counts 5 through 8 and stayed under section 654.

-22-

(Lodgment No. 14 at 34.)

However, as noted above, the United States Supreme Court subsequently reversed <u>Black I</u>, and held in <u>Cunningham</u> that California's sentencing scheme violated the Sixth Amendment because it authorized a judge, not the jury, to find facts allowing the imposition of the upper term.  <u>Cunningham</u>, 549 U.S. 270.  If Ortiz was sentenced to the upper terms on facts found by the judge,  other than the fact of a prior conviction, his sentence violates clearly established federal law.

Ortiz was sentenced to the upper terms on counts five through eight and to the upper term of ten years on the gun use enhancement on counts five through seven.  (Lodgment No. 2, vol. 12 at 1538.)  Ortiz claims that the court violated  <u>Blakely</u> and <u>Cunningham</u> because the "statutory maximum" was the middle term on counts five through eight, and the middle term of four years on the gun use enhancement.  (Traverse at 30.)

The trial court did not explain its choice of the upper term as to each count, except to state:

> Count 5, *for the reasons stated in the probation report*, the court is selecting the aggregate term of nine years, and a 10-year term pursuant to [12022.53(b)].  And those terms are both stayed pursuant to Penal Code section 654.

> Count 6, again the court is selecting the upper term of nine, and the 10-years for the .53 allegation.  Both terms stayed pursuant to Penal Code section 654.

> Count 7, upper term of .53(b) allegation of 10-years, .6(a) of two years.  Those are all stayed pursuant to Penal Code section 654.

> And, again, Count 8, upper term of six, on the residence six, upper term ten on the .5(a) allegation.  Both stayed pursuant to Penal Code section 654.

(Lodgment No. 2, vol. 12 at 1526 (emphasis added).)

The probation report lists six possible circumstances in aggravation, including Ortiz's prior convictions which were "numerous and of increasing seriousness."  (Lodgment No. 1, vol. 4 at 922.)  Under <u>Apprendi</u>, it was constitutionally permissible for the court to rely on the fact of Ortiz's prior convictions when sentencing him to the upper terms on counts five through seven, and for the gun use enhancement on counts five through eight.  <u>See</u> <u>Apprendi</u>, 530 U.S. at 490.  The probation report stated that Ortiz had prior convictions for the following offenses: carrying a loaded firearm in public, selling narcotics, being under the influence of a controlled substance in public, and driving under the influence.  (Lodgment No. 1, vol. 4 at 921-22.)

-23-

1   Ortiz argues that the trial court's incorporation by reference of the aggravating and mitigating

2   factors listed in the probation report does not satisfy the requirement of a statement of reasons under

3   California law.  (Traverse at 31.)  However, the United States Supreme Court in <u>Almendarez-Torres</u>

4   established that "the fact of a prior conviction need not be pleaded in an indictment or proved to a jury

5   beyond a reasonable doubt." <u>Almendarez-Torres</u>, 523 U.S. at 244, 247.  Furthermore, the Ninth Circuit

6   has held that the presence of only one aggravating factor is required to authorize an upper term sentence,

7   as long as that "factor alone would suffice to render the sentence constitutional if found applicable in

8   a manner consistent with the Sixth Amendment." <u>Butler</u>, 528 F.3d at 641.  The presence of four prior

9   convictions in Ortiz's record satisfies the requirement under <u>Apprendi</u> and is sufficient to justify the trial

10  court's imposition of the upper term sentences on counts five through eight and the upper term sentence

11  on the gun use enhancement on counts five through seven.  Therefore, the Court of Appeal's denial of

12  this claim was not contrary to, nor an unreasonable application of, clearly established federal law.

13  **V.    STAY AND ABEYANCE**

14  On October 25, 2007, Respondent filed an Answer and Memorandum of Points and Authorities

15  in Support of the Answer responding to Ortiz's petition, claiming in part that claim four was not

16  exhausted, and therefore the court should either dismiss the petition as "mixed," or permit Petitioner to

17  amend the Petition by dismissing the claim.  (Respt's Mem. at 19.)  Subsequently, on November 27,

18  2007, Petitioner filed a petition for writ of habeas corpus raising the issues presented in claim four in

19  the California Supreme Court.  (Supp. Lodgment No. 1.)  On December 17, 2007, Ortiz filed a Motion

20  for Stay and Abeyance in this court to allow him to exhaust claim four in state court. [Doc. No. 28.]  On

21  May 14, 2008, the California Supreme Court denied Petitioner's writ of habeas corpus.  Because

22  Petitioner has fully exhausted claim four, the Court recommends that Ortiz's Motion for Stay and

23  Abeyance be **DENIED** as moot.

24  ///

25  ///

26  ///

27  ///

28  ///

## VI.    <u>CONCLUSION AND RECOMMENDATION</u>

The Court submits this Report and Recommendation to United States District Judge William Q. Hayes under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.  For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order:  (1) approving and adopting this Report and Recommendation, (2) directing that Judgment be entered denying the Petition, and (3) denying Petitioner's Motion for Stay and Abeyance.

**IT IS ORDERED** that no later than **<u>August 29, 2008,</u>** any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **<u>September 12, 2008</u>**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156 (9th Cir. 1991).

**DATED:** August 14, 2008

Peter C. Lewis
U.S. Magistrate Judge
United States District Court

07cv0494